[5] The fact that the wife has remarried, and that the plaintiff has also remarried, is no reason why a court of equity should disregard the agreement, which was reasonable and fair when made. It is urged, however, that the remarriage of the wife after the assignments, under section 1771 of the Code of Civil Procedure, renders the transfers ineffectual so far as she is concerned, on the theory that the provision for her was in substance alimony. By order of the court made after her marriage the order granting alimony was modified, so that the plaintiff was not required to pay the $2,500 annually to his wife thereafter. The action for a separation was, by the understanding of the parties and the entire family, turned into an action for absolute divorce, and the interlocutory judgment of divorce in her behalf was granted on the day such change was made, upon proper evidence.

The provision of the Code that when the wife remarries the alimony granted to her by order of the court shall cease is reasonable and just. Such an order takes from the husband by force of law money for her support, and when she remarries, her support being provided for, it is reasonable that the forced payments from the late husband should cease. But where a husband voluntarily settles property upon a wife, either as a matter of love and affection, or duty, or in settlement of disputes between them, the conveyance is absolute, and uninfluenced by the fact that she obtains a divorce and subsequently remarries. These assignments were made in contemplation of an absolute divorce, and undoubtedly the provision for alimony was affected by the fact that under the assignment the wife and children, in 1915, would probably have an income of their own outside of the alimony. The court permitted the assignments to be made, but did not compel them. The permission was necessary, because the plaintiff was then a ward of the court. If it had been the intention of the parties that the wife should forfeit the benefit which she was to derive from the trust fund if she remarried, it should have been so stated in the assignment. If it had been stated, perhaps the remarriage would not have followed. In any event, it is too late to make a new assignment, and the court must interpret the one made by its permission upon a full understanding of the rights and interests of all the parties.

The judgment should therefore be affirmed, with costs. All concur, except SMITH, P. J., not voting.

---

(165 App. Div. 726)

FIRST NAT. BANK OF WAVERLY v. WINTERS. (No. 338/40.)

(Supreme Court, Appellate Division, Third Department. January 6, 1915.)

1. LIBEL AND SLANDER (§ 9*)—LIBEL—WHAT CONSTITUTES.

   False articles in a newspaper, charging that a bank, as mortgagee of a hotel, was instrumental in causing the sale of intoxicants to be carried on therein, in violation of law, and that the bank, which had not credited defendant with a deposit, after notifying him that his account had been overdrawn, admitted the mistake and gave credit for the deposit, are libelous, tending necessarily to injure the credit and business of the bank.

   [Ed. Note.—For other cases, see Libel and Slander, Cent. Dig. §§ 80–90; Dec. Dig. § 9.*]

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

2. LIBEL AND SLANDER (§ 69*)—DEFENSES.
  Where defendant published false statements tending to injure its credit, plaintiff bank could recover damages, unless defendant's reputation was such that his utterances would have no influence.
  [Ed. Note.—For other cases, see Libel and Slander, Cent. Dig. §§ 169, 170; Dec. Dig. § 69.*]

3. LIBEL AND SLANDER (§ 112*)—ACTIONS—EVIDENCE.
  In an action for libel, evidence *held* to show that defendant maliciously published defamatory articles concerning plaintiff.
  [Ed. Note.—For other cases, see Libel and Slander, Cent. Dig. §§ 325–341; Dec. Dig. § 112.*]

4. LIBEL AND SLANDER (§ 114*)—DAMAGES.
  Libelous articles, reflecting on the honesty of a bank, entitle the bank to substantial damages.
  [Ed. Note.—For other cases, see Libel and Slander, Cent. Dig. § 352; Dec. Dig. § 114.*]

Appeal from Trial and Special Term, Madison County.

Action by the First National Bank of Waverly, N. Y., against Byram L. Winters. From a judgment for defendant, and an order denying new trial, plaintiff appeals. Reversed and remanded.

See, also, 155 App. Div. 883, 139 N. Y. Supp. 426.

Argued before SMITH, P. J., and KELLOGG, LYON, HOWARD, and WOODWARD, JJ.

Hinman, Howard & Kattell, of Binghamton (Harvey D. Hinman, of Binghamton, of counsel), for appellant.

Byram L. Winters, of Waverly (James O. Moore, of Buffalo, and Coville & Moore, of Oneida, on the brief and of counsel), for respondent.

JOHN M. KELLOGG, J. The verdict is so clearly against the evidence that it is unnecessary to consider the exceptions taken upon the trial. The publications apparently were written by a lawyer, who had in mind the law of libel and was seeking to approach as nearly the dividing line between criticism and libel as he could without becoming liable to indictment or for damages. The articles are long, and are in various issues of his paper, and it is unnecessary to repeat them. No fair-minded man can read them without knowing just the meaning the writer intended to convey, and without appreciating the sense in which the ordinary reader would understand them.

[1-4] The plaintiff is carrying on a banking business in the village of Waverly. There is also another bank there. The defendant is a lawyer, and the editor of a paper in the village. The plaintiff had a mortgage upon the Tioga Hotel, in the village, for $6,000; the hotel being insured for about $12,000. Some of the policies were for the benefit of the mortgagee. The mortgage covered other real estate, worth from $3,000 to $4,000.

The first article, in substance, charged that traffic in liquor was being carried on in the hotel under a license issued to a man who had been dead two years, and that the place had been kept open in order to protect the mortgage, and that it was done against the

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

wishes of the owner, who did not want a license in this place, and did not want it continued in the manner in which it is being run. The only fair and reasonable intent and meaning of the article is a charge that the plaintiff was causing this business to be carried on in violation of law.

The next article related to the burning of the hotel, which took place after the publication of the first article. If it meant anything, and was not the utterance of a man who did not know what he was talking about, it intended to charge, and could only be understood as charging, that the plaintiff had burned the hotel, or caused it to be burned, in order to get the insurance money.

Another article, if understood by the man who wrote it, and as it must have been understood by those who read it, charged the bank with stealing from the defendant $100. It was accompanied by a statement that he had deposited $100 with the bank to the credit of his paper, the Waverly Free Press-Record, which had not been credited upon the bank book, and that afterwards the bank reported that his account was overdrawn. He claimed otherwise, and the bank wrote him that they were not infallible, and had made a mistake, and that thereafter he changed the Free Press account to the other bank. No such transaction ever took place. He did have an account in the bank in the name of the Waverly Free Press-Record. There was also an account in the bank in the name of the Waverly Fire Department. Two checks had been drawn by the Waverly Fire Department, which by the mistake of some clerk in the bank had been charged upon the ledger against the Free Press account. This error resulted in an apparent overdraft of the Free Press account of $81.30. The circumstance was discovered promptly, and explained apparently to the defendant's satisfaction in October, 1907, as he continued the account in the bank; the last deposit being September 21, 1908. He evidently grasped this little circumstance to base upon it a false publication, intending to be understood, and being understood, as charging the bank with the crime of larceny.

The facts relating to the fourth charge were sworn to by the witness Nicholson, who overheard a conversation between one Mickleham and defendant to the effect that the defendant said he was going to start a new bank, and had parties who would subscribe $75,000. Mickleham suggested that it would be better to consolidate the present banks, and make one strong bank, rather than to start more. Defendant said, with reference to the plaintiff:

"They were the biggest lot of sons of bitches he knew, and that they were thieves and robbers, and that they tried to steal $100 from him, and that he would land the gang before he got through with them."

On cross-examination the witness said that the defendant made some explanation with reference to the $100 that the bank tried to steal from him. He really could not follow the conversation through, but understood that the bank had written a letter about an overdraft, and had written that it was their mistake.

The defendant was not sworn as a witness, and it did not appear that he believed any of the statements were true. This evidence from a witness is uncontradicted:

"Defendant said, 'I am going to bust the bank;' and I said, 'What is your object in busting the bank?' and he said, 'If I do, I will start one of my own.'"

This last statement furnishes the only reasonable explanation why a lawyer and editor could make these utterances against the plaintiff. A bank must exist and do business by virtue of the confidence which the public has in it. Its reputation for honesty and fair dealing and faithfulness is its greatest asset, so far as obtaining business is concerned. If a bank is a known violator of the criminal law, a thief, it has no right to exist. The defendant's utterances necessarily tended to injure the credit and the business of the bank and to destroy its good reputation. They were made for that purpose. The plaintiff necessarily suffered damages, unless the defendant's position in the community was such that his utterances could have no influence; and we cannot assume that his deliberate statements would be disregarded by all.

It is a reproach to the due administration of the law if a lawyer and editor of a paper can with impunity make these false and malicious charges against a bank, for the purpose of destroying its business and with the hope of building up a business of his own. The falsity of the charge and the express malice are proved beyond all question. That there was any possible excuse for the utterances is not indicated by the evidence. The finding of the jury is so unusual, so contrary to all the evidence, that it cannot be allowed to stand. The case is not one where a verdict in favor of the defendant can stand upon the evidence; neither is it a case for nominal damages. The facts as proved entitled the plaintiff to recover very substantial damages.

The judgment is therefore reversed, and a new trial granted, with costs to the appellant to abide the event. The court disapproves of the finding that the defendant did not libel and slander the plaintiff, and that the plaintiff is not entitled to recover damages therefor. All concur.